# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

NICHOLAS S. SMITH,

            Plaintiff,

    v.                                        Case No.   13-C-306

CAROLYN W. COLVIN,
Commissioner of Social Security,

            Defendant.

---

## DECISION AND ORDER

---

This is an action for review of the final decision of the Commissioner of Social Security denying Plaintiff Nicholas Smith's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. § 1381 *et seq.* For the reasons given below, the decision of the Commissioner will be reversed and remanded pursuant to 42 U.S.C. § 405(g) (sentence four).

## I. Background

Smith, currently age 35, resides at his parents' home with his wife and three children. (Tr. 116.) He was previously employed as a farm worker, foundry worker, and combine driver, and he alleges disability due to a combination of mental and physical impairments. (Tr. 142–43.) On September 23, 2003, he underwent a mental status consultative examination with Steven Krawiec in connection with an earlier disability application. (Tr. 371–74.) At that time, Smith was 25 years old. Dr. Krawiec administered the WAIS-III IQ test and found that Smith's verbal IQ was 66, his

performance IQ was 80, and his full scale IQ was 70. (*Id.*) Based on his examination, Dr. Krawiec made an Axis I diagnosis of adjustment disorder with depressed mood and an Axis II diagnosis of mental retardation. (Tr. 374.)

Smith's physical ailments began as early as April 1998, when he injured his left shoulder using a sledgehammer. (Tr. 345.) Joseph DiRaimondo, M.D., performed shoulder surgery on September 21, 1998. (Tr. 346.) Smith subsequently fractured his right ankle in an all-terrain vehicle (ATV) accident on July 13, 2005. (Tr. 499.) He underwent surgery to repair the ankle, and then physicians removed pins and other hardware from the ankle in October 2005 and August 2007. (Tr. 436, 474.) Smith was also diagnosed with mild carpal tunnel syndrome on November 22, 2005. (Tr. 442.)

Smith filed the current application for SSI on January 26, 2010, alleging disability beginning January 26, 2010, due to "mental retardation, shoulder pain status post clavicle resection, right ankle pain status post ankle surgery, neck and back pain (possibly discogenic), joint pain, fatigue, migraines, and reduced sensation and numbness in both arms." (Tr. 26.) His application was denied initially and on reconsideration, and he requested a hearing. (Tr. 167, 179.) On October 13, 2011, a video hearing was held before ALJ Patricia E. Hartman ("the ALJ") at which Smith, represented by counsel, and a vocational expert (VE) testified. (Tr. 110–47.)

At the hearing, Smith testified that he was in special education classes in school and did not graduate high school. (Tr. 117.) He reported that his reading ability is limited to a fifth or sixth grade level, which allows him to read children's books but not newspapers. (Tr. 118.) He claimed he did not understand multiplication and division but could add and subtract on paper, and he would have to use paper to calculate the change on a purchase made with a $5 bill. (*Id.*) He testified he

was no longer able to help his 12-year old daughter with homework because it was "getting too hard" for him. (Tr. 139.) He also reported that he drove a car two to three times per week, but not far from home. (Tr. 117.) When asked whether he had problems remembering things, he described the experience of forgetting that he stopped at a stop sign. (Tr. 126.) He reported problems with concentration and some difficulty understanding instructions, depending on complexity. (Tr. 126–27.) In addition to learning problems, Smith stated that "once in a great while" he does not feel like getting out of bed or leaving the house. (Tr. 124.) He indicated that he did not take any medication for depression. (*Id.*)

As for Smith's physical impairments, Smith testified that he was unable to work due to back, neck, and ankle pain. (Tr. 121.) This pain bothered him "most of the time" and caused him to wake up every two hours. (*Id.*) He stated that about two to three times a month, his back would "flare up" and he would go to the doctor to get an IV and painkillers. (*Id.*) As an example, he reported that two days prior to the hearing he had visited the emergency room because his back and neck froze up on him. (Tr. 122.) Smith explained that his pain was located in his upper back and extended up into the left side of his neck. (Tr. 135–36.) He described his back pain as "constant" and indicated that cortisone shots provided relief. (Tr. 123.) He occasionally took prescription hydrocodone but otherwise used ibuprofen to manage his pain while at home. (Tr. 121–22.) He testified that he also had pain in both shoulders, although the left shoulder caused him the most pain. (Tr. 134.) He indicated that physical therapy had previously helped his shoulder and carpal tunnel syndrome, but his carpal tunnel was starting to come back. (*Id.*) He wore braces on his wrists two or three times per week. (Tr. 136.) Smith also reported that if he slept wrong, he would get back spasms and wake up with migraines. (*Id.*) The back spasms prevented him from reaching overhead.

(*Id.*)  As for his ankle, Smith testified that after three surgeries, he was having problems with the joint and experienced swelling about 70% of the time.  (Tr. 137.)  On bad days, the ankle would turn black and blue.  (*Id.*)  He stated that he was given a "bracelet" (a brace) for his ankle in physical therapy, but he could only wear the brace for two to three hours per day.  (Tr. 137–38.)

Smith testified that he experienced more pain in his back if he sat for a long time and more pain in his ankle if he walked for a long time.  (Tr. 124–25.)  He estimated that he could sit for one to one and a half hours, stand on his "good leg" for "quite a while," though he might require hourly breaks to relieve stiffness, walk a little over a half mile to a mile, and lift up to 50 pounds.  (Tr. 125–26.)  Smith stated that he "would usually suffer" after walking a half mile and would have to sit down and let his ankle rest.  (Tr. 126.)  When asked to give examples of things he could lift, Smith reported that he lifted up his kids and that once a year, he helped a friend move 50-pound pigs.  (Tr. 134–35.)  Smith testified that around the house, he would do some cooking and dishwashing, and he occasionally did laundry.  (Tr. 127.)  He picked vegetables in his mother's garden, did a little bit of grocery shopping, and occasionally mowed the lawn on his good days.  (Tr. 128.)  He could watch the kids by himself and went fishing every once in a while.  (Tr. 128–29.)

Smith recounted that he previously worked in a factory, as a combine driver, on a farm milking cows, and at a tree nursery.  (Tr. 118–21.)  He also reported that within the past five years, he had engaged in some farm work on his family members and friends' farms.  (Tr. 132–33.)  Within the past two years, he had occasionally worked on a friend's farm in exchange for gas money.  He stated that he had gone to his friend's farm a few times in the past month to drive a tractor that chops corn.  (Tr. 133.)  He claimed that he only worked for about 20 minutes and that he never earned more than $50.00 in a month.  (Tr. 132–33.)

4

On November 2, 2011, the ALJ found that Smith was unable to perform his past relevant work but was not disabled because he could perform other jobs that existed in significant numbers in the national economy. (Tr. 27.) At step two of the sequential analysis, the ALJ found that Smith's only severe impairment was mental retardation, and at step three, the ALJ found that this impairment did not meet Listing 12.05 (the applicable Listing for mental retardation). (Tr. 21, 25.) She also found that Smith exhibited no restrictions in activities of daily living, mild difficulties in social functioning, and mild difficulties in concentration, persistence, or pace. (Tr. 23–24.) At step four, the ALJ must determine the individual's residual functional capacity (RFC), or "what an individual can still do despite his or her limitations." S.S.R. 96–8p, 1996 WL 374184, at *2. The RFC represents the maximum a person can do, despite his limitations, on a "regular and continuing basis," which means roughly eight hours a day for five days a week. *Pepper v. Colvin,* 712 F.3d 351, 362 (7th Cir. 2013). Smith's RFC indicated that he could perform a full range of work at all exertional levels but included the following restrictions: "based on his mental retardation and concerns that he might not take proper precautions, he should not work at unprotected heights or with dangerous unprotected machinery;" "[h]e is limited to simple, routine, and repetitive tasks;" and "he reads below a sixth grade level and can only perform basic addition and subtraction." (Tr. 25.) In her opinion, the ALJ found that Smith was not fully credible. (Tr. 26.) She afforded great weight to the opinions of consulting physician Dr. Krawiec, who administered the IQ test and initially diagnosed Smith with mental retardation, and state agency psychological consultants Beth Jennings, Ph.D., and Jack Spear, Ph.D., who opined that Smith's impairments did not satisfy Listing 12.05. (Tr. 27.) She also afforded great weight to the opinion of Paul Baek, M.D., a consulting neurologist who examined an MRI of Smith's cervical spine in March 2011 and found that it was

5

virtually unremarkable. (Tr. 22, 546.) Based on Smith's RFC and the testimony of the VE, the ALJ found Smith could work as a production inspector or machine feeder and was therefore not disabled. (Tr. 28.) The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–3.)

## II. Analysis

An ALJ's conclusion of no disability is reviewed with deference and will be upheld if it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court reviews the entire record but does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). An ALJ need not specifically address every piece of evidence, but must provide a "logical bridge" between the evidence and his conclusions. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010) (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)). An ALJ must also "confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003).

Smith contends the ALJ erred in four respects. He contends that (1) the ALJ erred in failing to properly assess Smith's physical impairments as severe impairments at step two of the sequential analysis; (2) the ALJ's analysis of Listing 12.05C at step three of the sequential analysis is not supported by the longitudinal record; (3) the ALJ failed to incorporate all material limitations of Dr.

6

Krawiec's opinion into her RFC determination and VE hypothetical; and (4) the ALJ erroneously failed to consider the lay witness testimony of Lisa Smith. (Pl.'s Br. at 9–10, ECF No. 10.) The court will address Smith's first two claims together since they both concern the ALJ's treatment of Listing 12.05.

### A. Listing 12.05 (Mental Retardation)

Smith contends the ALJ erred at step three in finding that he did not meet the requirements of Listing 12.05C. Before examining Smith's arguments, the court will first articulate the principles of law which govern steps two and three of the sequential analysis. At step two, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 C.F.R. § 416.920(c). An impairment or combination of impairments is "severe" if it significantly limits an individual's ability to perform basic work activities. *Id.* At step three, the ALJ must determine whether the claimant has an impairment, or combination of impairments, which meets or equals an impairment found in the Listing of Impairments. *See* 20 C.F.R. § 404, Subpt. P, App. 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926). The claimant bears the burden of proving his condition meets or equals a listed impairment. *Steward v. Bowen*, 858 F.2d 1295, 1297 n.2 (7th Cir. 1988). If the claimant's impairment or combination of impairments is severe enough to meet or medically equal the criteria of a Listing and meets the duration requirement set forth in 20 C.F.R. § 416.909, then the claimant is disabled. 20 C.F.R. § 416.925(c)(3). If no Listing is met, the ALJ proceeds to step four and determines the claimant's RFC.

Here, the ALJ found that Smith's only severe impairment was mental retardation, and she then proceeded to assess whether Smith's impairment met the applicable Listings. To meet Listing

12.05C, a claimant must meet the diagnostic definition of mental retardation in Listing 12.05 (a threshold requirement) plus the severity requirement of 12.05C, articulated as follows:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

Tr. 525; 20 C.F.R. § 404, Subpt. P, App. 1 § 12.05; *Mendez v. Barnhart,* 439 F.3d 360, 362 (7th Cir. 2006). Where IQ testing provides verbal, performance, and full scale scores, the lowest of the three scores must be used. 20 C.F.R. § 404, Subpt. P, App. 1 § 12.00(D)(6)(c). The ALJ found Smith "did not meet the threshold requirement that his intellectual functioning deficits were initially manifested before age 22" because his reports of being in special education in high school were insufficient and the record did not contain any cognitive testing or educational records from before the age of 22. (Tr. 25.) She also found that "neither [Smith's] physical conditions nor his adjustment disorder with depressed mood impose additional or significant work-related limitation of function." (*Id.*) Smith challenges both of these findings.

First, Smith contends the ALJ should have found that he established the onset of mental retardation prior to age 22 based on the findings of Drs. Krawiec, Jennings, and Spear, his IQ scores, and his history of special education. On September 23, 2003, Dr. Krawiec conducted a consultative psychological examination for a prior disability application. (Tr. 371–75.) Dr. Krawiec observed

8

that Smith had taken special education courses in school and diagnosed him with mental retardation. (Tr. 371–74.) He also found that Smith's verbal IQ was 66, his performance IQ was 80, and his full scale IQ was 70. (Tr. 374.) On March 24, 2010, Dr. Jennings conducted a review of Smith's medical history and opined that although Smith did not satisfy Listing 12.05C, he did satisfy the threshold requirement of Listing 12.05. (Tr. 525, 537.) Dr. Jennings' findings were affirmed by Dr. Spear on June 24, 2010. (Tr. 540.) In the ALJ's analysis of Smith's credibility, she gave the opinions of Drs. Krawiec, Jennings, and Spear "great weight" and did not discount any of their findings. (Tr. 26–27.)

As Smith notes, courts have generally assumed that mental retardation is established prior to age 22 when testing occurs later in life, citing *Guzman v. Bowen*, 801 F.2d 273, 275 (7th Cir. 1986). In *Guzman*, the Seventh Circuit affirmed that "in the absence of evidence leading to a contrary result 'we must and do assume' that an IQ test taken after the insured period correctly reflects the person's IQ during the insured period." 801 F.2d at 275 (citing *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985)); *see also Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007) ("The requirement of early onset and the reference to the claimant's "developmental period" seem intended to limit coverage to an innate condition rather than a condition resulting from a disease or accident in adulthood.") (internal citation omitted). Since mental retardation is generally a "lifelong condition," the court in *Guzman* assumed that an IQ score recorded in 1982 reflected the claimant's IQ in 1979. 801 F.2d at 275. Here, the ALJ erred by requiring Smith to present "cognitive testing" from before the age of 22. Dr. Krawiec administered Smith's IQ tests when he was 25 years old and diagnosed him with mental retardation. The ALJ did not suggest that any intervening trauma between the ages of 22 and 25 influenced Smith's tests scores, nor did she question the validity of

the test scores. *Cf. Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) (affirming ALJ's finding that IQ score was invalid). The ALJ therefore should have presumed that Smith's IQ scores reflected his intellectual functioning prior to age 22.

The Commissioner contends the ALJ's decision should be upheld because Smith did not meet his burden to establish deficits in adaptive functioning. In addition to "significantly subaverage general intellectual functioning," Listing 12.05 requires that the claimant have "deficits in adaptive functioning initially manifested during the developmental period." Deficits in adaptive functioning "denotes inability to cope with the challenges of ordinary everyday life." *Novy*, 497 F.3d at 710; *see also Fischer v. Barnhart*, 129 F. App'x 297, 302 (7th Cir. 2005) ("Although low IQ scores are indicative of retardation, other factors, such as the claimant's life activities, properly play into the ALJ's analysis.") (citation omitted). The "deficits in adaptive functioning" requirement exists because "persons with an IQ in the 60s (or even lower) may still be able to hold a full-time job." *Id.* (citing *Mendez v. Barnhart*, 439 F.3d at 361). Thus, an IQ between 60 and 70 "is insufficient, even with the presence of some impairment, to establish disability per se on grounds of mental retardation." *Novy*, 497 F.3d at 709.

The Commissioner cites Dr. Jennings' medical source statement for support because she found that Smith did not meet Listing 12.05C and opined that Smith had no more than moderate limitations in maintaining activities of daily living, mild restrictions in maintaining social functioning, and moderate limitations in maintaining concentration, persistence, or pace. (Tr. 531, 533.) The Commissioner also cites Smith's testimony that he engaged in daily activities such as cleaning, using a computer, watching television, driving, shopping, and caring for his children. In rebuttal, Smith contends that the Commissioner is precluded from presenting this argument because

10

the ALJ did not address Smith's deficits in adaptive functioning. The Seventh Circuit has held that under what it calls the *Chenery* doctrine, the Commissioner is precluded from relying on evidence or a rationale for upholding the ALJ's decision that does not appear in the ALJ's decision. *See, e.g., Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013). Although the actual holding of *Chenery* does not appear to support such a broad rule, *see Senn v. Astrue,* No. 12–C–326, 2013 WL 639257, at *6–9 (E.D. Wis. Feb. 21, 2013), Smith is correct that the ALJ's analysis of his adaptive functioning was cursory at best. Moreover, Dr. Jennings and Dr. Spear, whose opinions the ALJ gave "great weight," expressly found that Smith did meet the threshold requirement of Listing 12.05. (Tr. 525, 540.) If the ALJ addressed adaptive functioning in her discussion of Listing 12.05C, she did so only by noting that Smith's reports of being in special education were insufficient. (Tr. 25.) This fact alone does not constitute substantial evidence that Smith did not have deficits in adaptive functioning, and if the ALJ intended to discount the opinions of Drs. Krawiec, Jennings, and Spear, she was required to explain her rationale for doing so in greater detail. *See Clifford v. Apfel,* 227 F.3d 863, 874 (7th Cir. 2000) (explaining that the reviewing court "must be able to trace the ALJ's path of reasoning").

The ALJ therefore erred in her assessment of the threshold requirement of Listing 12.05; this error in itself, however, only invites reversal if the ALJ also erred in finding that Smith did not have a "physical or other mental impairment imposing an additional and significant work-related limitation of function." *See supra* Listing 12.05C. The Commissioner first asserts that the ALJ's determination of severity at step two is a threshold issue and any error would not necessitate remand. The court generally does not order remand at step two if the ALJ failed to find an impairment "severe" so long as the ALJ has found at least one severe impairment and proceeded

11

to assess the claimant's RFC.  *See Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012).  Here, however, the ALJ's assessment of severity at step two was more than a threshold finding and could have determined whether Smith met Listing 12.05C.  Thus, the court rejects the Commissioner's argument that any error at step two would have been harmless and proceeds to address Smith's arguments.

Smith contends that five of his impairments satisfy Listing 12.05C: (1) surgically repaired right ankle, (2) degenerative changes to bilateral acromioclavicular (AC) joints, (3) bilateral carpal tunnel syndrome, (4) Multilevel degenerative disc disease of the cervical spine, and (5) adjustment disorder.  In Smith's view, the standard for finding that an impairment imposes an "additional and significant work-related limitation of function" is lower than the standard for finding an impairment "severe" at step two of the sequential analysis, which requires a finding that the impairment significantly limits an individual's ability to perform basic work activities.  *See* 20 C.F.R. § 416.920(c).  He cites *Hinkle v. Apfel*, 132 F.3d 1349, 1351–52 (10th Cir. 1997) and *Hall v. Apfel*, 122 F. Supp. 2d 959, 966 (E.D. Ill. 2000), cases in which courts defined a "significant limitation" of function for purposes of Listing 12.05C as one that has more than a slight or minimal effect, but less than a severe effect, on the claimant's ability to perform basic work activities.  The law in this area has progressed, however, and courts in this circuit now typically equate the two standards.  *See Higgins v. Barnhart*, 42 F. App'x 846, 849–50 (7th Cir. 2002) (affording substantial deference to SSA's interpretations of its own regulations and observing that "the newly revised § 12.00A, which provides guidance for evaluating mental disorders, equates 'additional and significant' with 'severe'"); *Kelley v. Colvin*, No. 12–C–064, 2014 WL 524642, at *12 (N.D. Ind. Feb. 10, 2014) (following *Higgins*); *Peterson v. Astrue*, No. 09–C–50084, 2010 WL 5423751, at *6 (N.D. Ill. Dec.

22, 2010) (same). Although the difference is not dispositive here, this court agrees with the reasoning of *Higgins* and concludes that the ALJ erred only if she failed to find that Smith's additional impairments were "severe" at step two of the sequential analysis.

The ALJ's findings at step two were supported by substantial evidence. In assessing Smith's physical impairments, the ALJ gave great weight to the opinion of state agency medical consultant Robert Callear, M.D., who opined on March 16, 2010, that Smith's physical impairments were non-severe and did not cause significant limitations. (Tr. 23, 520.) Dr. Callear's opinion was affirmed by George Walcott, M.D., on June 17, 2010. (Tr. 539.) These medical opinions support the ALJ's conclusion that Smith's physical impairments did not impose significant limitations. In addition, the ALJ observed that Smith did not seek treatment for any allegedly disabling conditions between January 2010 and March 2011, and that the treatment he did receive was "routine, conservative, and infrequent." (Tr. 23.) She noted that Smith was discharged from physical therapy in June 2011 after meeting all of his short and long term goals. (Tr. 22, 649.)

Smith primarily argues that the ALJ failed to properly consider evidence concerning his physical impairments submitted after Drs. Callear and Walcott reviewed his medical records. He contends the ALJ failed to consider June 2011 physical therapy records indicating that Smith was complaining about right ankle pain and that his gait was extremely poor. (Tr. 645.) But the ALJ did consider these records, as she noted that "[Smith] was given a toe brace, which improved his gait and minimized his right ankle pain." (Tr. 22.) As for Smith's shoulder, Smith notes that in March 2011, an X-ray revealed bilateral degenerative changes of the AC joints. (Tr. 552.) However, the same treatment record indicated that the X-ray showed "no acute findings" and characterized the degenerative changes as "minimal." (*Id.*) Regarding his back and neck, Smith

13

notes that a 2011 MRI revealed multilevel degenerative disc disease, multilevel spinal stenosis, and multilevel neural foraminal encroachment. (Tr. 556–57.) The ALJ cited this treatment record, however, and she also cited the May 2011 report of Paul Baek, M.D., a specialist who performed a neurological consultative examination to evaluate Smith's neck pain and left parascapular discomfort. (Tr. 22.) Dr. Baek reported that Smith "hardly had any pain" and found his flexion and extension "unremarkable." (Tr. 546.) He also noted that the MRI of Smith's cervical spine was "virtually unremarkable" and opined that Smith's symptoms were "muscular in origin." (Tr. 546–47) He discussed with Smith the option of trying epidural steroid injections, but Smith opted to try physical therapy first. (Tr. 547.) Dr. Baek's opinion substantially supports the ALJ's findings. Smith also notes that he was diagnosed with mild bilateral carpal tunnel syndrome in April 2011, and that he struggled to use his left hand for daily tasks. (Tr. 567.) But as the ALJ observed, Jonathan Henry, M.D., noted in May 2011that his carpal tunnel had improved with physical therapy and splinting. (Tr. 22, 554.) The medical evidence cited by the ALJ supports her conclusion that Smith's physical impairments did not impose significant limitations.

As for Smith's mental impairments, Smith highlights that Dr. Krawiec and Dr. Jennings both diagnosed him with "adjustment disorder with depressed mood." (Tr. 374, 521.) Although this is accurate, Dr. Jennings also opined that Smith did not meet Listing 12.05 based on his IQ scores plus his "psych issues," presumably referring to his adjustment disorder. (Tr. 537.) The ALJ gave Dr. Jennings' opinion great weight, and the opinion substantially supports the ALJ's finding that Smith's adjustment disorder was not a severe impairment for purposes of 12.05C.

Smith also points to his own testimony as evidence. He testified that his ankle was swollen about 70% of the time and occasionally turned black and blue, that his back muscles were tight, and

14

that his shoulder was in constant pain. (Tr. 134, 135, 137.) He also testified that his carpal tunnel syndrome was causing pain now that he was no longer in physical therapy. (Tr. 554.) Regarding his adjustment disorder with depressed mood, Smith testified that he sometimes had difficulty getting out of bed because he was so sad. (Tr. 124.) Smith's attempt to use these statements fails because the ALJ found Smith's subjective complaints less than fully credible. (Tr. 26.) Although Smith does not directly challenge the ALJ's credibility determination, the court observes that the ALJ's findings were supported by substantial evidence. The ALJ found that Smith's physical conditions were less limiting than alleged based on his activities of daily living and rare use of narcotic pain medication. (Tr. 22.) Smith testified that he lifted his children, picked vegetables in the garden, and helped his friend and family with their farms—which included driving a tractor and moving pigs. (Tr. 24.) In January 2010, Smith presented with a stiff neck but reported that he did not take any pain medications. (Tr. 21, 508.) In addition, the ALJ noted that Smith did not take medication or see a psychiatrist or therapist for his adjustment disorder, and she observed that he did not discuss his adjustment disorder with his clinicians. (Tr. 26.) Since the ALJ reasonably found that Smith's complaints were not fully credible, she was entitled to discount his testimony.

In sum, the ALJ's step two findings regarding Smith's physical impairments are supported by substantial evidence. Although the ALJ erred at step three in her assessment of the threshold requirement in Listing 12.05, this error does not necessitate remand.

### B. Dr. Krawiec's Opinion

Smith contends the ALJ failed to incorporate into her RFC and VE hypothetical all material limitations contained in the medical source statement of Dr. Krawiec. On September 23, 2003, Dr.

Krawiec administered the WAIS-III test and found that Smith's verbal, performance, and full scale

IQ scores were 66, 80, and 70, respectively. (Tr. 374.) He also provided the following summary:

> This is an individual with some intellectual limitations. The nature of these limitations is such that he would be suited only for jobs with simple instructions for tasks of a redundant variety. Even at that, he might need some close supervision and guidance at least initially. Provided that he was not asked to do things beyond his capacity, I believe that he could persist at tasks. I am not sure that he would be able to maintain adequate pace in a competitive work environment. He spoke of having a pain condition associated with his shoulders and, as such, he might not be suited for jobs that involved much in the way of physical exertion. As I understood him to speak of it, that is why he is no longer doing farm work which is what he seems to like doing. I do not have reason to think that he would have trouble getting along with coworkers, supervisors, etc. Significant problems with attention, concentration, or memory were not in evidence. Workplace changes would be inadvisable in my view. As mentioned previously, I believe that he would have the best chance for success with redundant simple tasks. Workplace stresses, I believe also might create some difficulties for him. . . .

(*Id.*) The ALJ highlighted the following findings from Dr. Krawiec's narrative in her opinion:

Smith was limited to jobs with simple instructions for a variety of redundant tasks; Smith would

initially need close supervision and guidance; and Dr. Krawiec did not observe significant problems

with attention, concentration, or memory. (Tr. 27.) The ALJ indicated she afforded Dr. Krawiec's

opinion "great weight" because his opinion is consistent with his testing and interview and with the

medical record and testimony." (*Id.*)

Smith argues that the ALJ erred because she failed to include in the RFC and VE

hypothetical Smith's need for close supervision and guidance, his limitations with regard to pace,

and his difficulties dealing with workplace changes and workplace stress. Smith cites *Stewart v.

Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) for the proposition that "[w]hen an ALJ poses a

hypothetical question to a vocational expert, the question must include all limitations supported by

medical evidence in the record." In response, the Commissioner notes that an ALJ is not required

16

to adopt all opinions contained in medical source statements.  *See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) ("an ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians.").  The Commissioner is correct that the ALJ is ultimately responsible for formulating the RFC based on all evidence in the record.  *See* 20 C.F.R. § 416.946(c); S.S.R. 96–5p, 1996 WL 374183, at *4 ("A medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s).").  To say that the ALJ was not required to accept all of Dr. Krawiec's opinions, however, does not fully describe the ALJ's obligations when evaluating a medical source statement.

The ALJ must always build a logical bridge from the evidence to her RFC finding and disability determination.  *O'Connor-Spinner*, 627 F.3d at 618 (citing *Getch*, 539 F.3d at 480).  "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  S.S.R. 96–8p, 1996 WL 374184, at *7.  In addition, although the ALJ need not mention every piece of evidence, she has an "obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding."  *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citing *Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir. 2009)).  Especially where, as here, the ALJ gives a medical opinion great weight, the ALJ must explain why limitations included in the opinion are not included in the RFC.

Here, unfortunately, the opinion of Dr. Krawiec is not as clear as Smith's argument presupposes. Dr. Krawiec did not say that Smith would need close supervision and guidance and that he had limitations as to pace. What he said was "he might need some close supervision and guidance at least initially," and "I am not sure that he would be able to maintain adequate pace in a competitive work environment." (Tr. 374.) In other words, instead of offering his opinion on these key questions, Dr. Krawiec offered his uncertainty. This is unhelpful, and the SSA and the state agencies that assist it should demand greater clarity and precision from the consultants it pays to assist it in the important task of evaluating disability claims. Indeed, the SSA's own regulations require that reports of consultative examinations be reviewed to determine "[w]hether the report provides evidence which serves as an adequate basis for decisionmaking in terms of the impairment it assesses." 20 C.F.R. § 404.1519p(a)(1). Smith did not challenge the adequacy of the report, however. His argument is that the ALJ failed to include in the RFC the limitations that Dr. Krawiec found. But because Dr. Krawiec offered only uncertainty as to whether Smith needed close supervision and guidance, and whether he could maintain pace in a competitive environment, the ALJ was not required to include them in her RFC or offer an explanation for her failure to do so.

Notwithstanding Dr. Krawiec's uncertainty, however, the ALJ did find that Smith would "initially need close supervision and guidance" in any employment. (Tr. 27.) Yet, despite this finding, the ALJ failed to include such a limitation in her RFC or in the hypothetical she posed to the VE. This was error. The ALJ is not required to adopt every limitations offered by a medical expert, as long as she explains why she does not. But where the ALJ does adopt a limitation, she must incorporate it into her RFC and in her hypothetical to the VE. *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004). The failure to do so here requires remand. Given the uncertainty

expressed by Dr. Krawiec as to Smith's ability to handle the pace of competitive work and the fact that Dr. Jennings' opinion appears to have been limited to whether he met Listing 12.05 (Tr. 537), the questions of whether Smith has limitations in pace and whether he will only need guidance and supervision initially should also be explored on remand.

### C. Lay Testimony

Smith contends the ALJ failed to properly consider the lay testimony of Smith's wife, Lisa Smith, who offered sworn testimony following the hearing. (Tr. 303–14.) Mrs. Smith testified that Smith "gets confused fast" and sometimes does not understand what people are saying to him. (Tr. 307.) She testified that he could only read children's books and could not keep a checkbook or pay bills. (Tr. 308.) In describing Smith's physical's impairments, Mrs. Smith testified that he complained about pain in his ankle, shoulders, arms, and neck at least three times per week and that he woke up four times per night because of pain. (Tr. 309.) She explained that at times he could do laundry and mow the lawn, but at least once a week his ankle would lock up and prevent him from engaging in those tasks. (*Id.*) When asked whether Smith could survive on his own without her assistance, Mrs. Smith stated that he could feed and clothe himself appropriately but would probably need assistance with driving, working, and childcare. (Tr. 311.)

The ALJ referenced Mrs. Smith's testimony only once in her decision. In the context of addressing whether Smith satisfied the criteria of Listing 12.05A, the ALJ explained that "the requirements in paragraph A are met when there is mental incapacity evidenced by dependence upon others for personal needs (e.g. toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded." (Tr. 25.) The ALJ found Smith did not meet these requirements because he had "no limitations with

19

respect to daily living." (Tr. 25.) The ALJ then stated: "Further, the claimant's wife agreed that he would be able to care for himself on his own." (Tr. 25, 310.)

Under SSA regulations, ALJs must consider statements from lay witnesses when assessing the claimant's credibility. *See* 20 C.F.R. § 416.945(a)(3) ("We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons."). ALJs are not required to incorporate these statements into the RFC and may discount the testimony if they find that it conflicts with the medical evidence or otherwise lacks credibility. *See Arnold v. Barnhart*, 473 F.3d 816, 821–22 (7th Cir. 2007); *Cirelli v. Astrue*, 751 F. Supp. 2d 991, 1008–09 (N.D. Ill. 2010). The ALJ should not, however, simply presume that the lay witness is biased based on his or her relationship to the claimant and ignore the testimony on that basis. *See, e.g.*, *Behymer v. Apfel*, 45 F. Supp. 2d 654, 663–64 (N.D. Ind. 1999) ("When an ALJ fails to believe lay testimony about a claimant's allegations of pain or other symptoms, he should discuss the testimony specifically and make explicit credibility determinations.") (citing *Smith v. Heckler,* 735 F.2d 312, 313 (8th Cir. 1984)).

Here, the ALJ's cursory analysis of Mrs. Smith's testimony does not suffice. The ALJ did not discuss Mrs. Smith's testimony in the context of Smith's credibility determination, and it is unclear whether she afforded it any weight. Mrs. Smith's testimony, if properly considered, may corroborate some of Smith's subjective complaints. On remand, the ALJ should address Mrs. Smith's testimony in accordance with the principles discussed above. If this assessment affects the ALJ's analysis of Smith's credibility, then the ALJ should also reconsider whether any of his

physical or mental impairments qualify as "severe" impairments at step two of the sequential analysis.

### III. Conclusion

Accordingly, and for the reasons set forth above, the Commissioner's decision in this case must be remanded pursuant to 42 U.S.C. § 405(g)(sentence four) for proceedings consistent with this opinion.  The Clerk is directed to enter judgment forthwith.

**SO ORDERED** this   26th   day of March, 2014.

 s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court